## NATIONAL BRICK CO. v. UNITED STATES.
### No. 8047.

United States Court of Appeals for the District of Columbia.

Argued Oct. 5, 1942.

Decided Oct. 26, 1942.

Messrs. Edwin C. Dutton and Richard E. Wellford, both of Washington, D. C., for appellant.

Mr. John P. Hearne, of the Bar of the State of California, pro hac vice, by special leave of Court, with whom Norman M. Littell, Assistant Attorney General, and Messrs. Vernon L. Wilkinson and Alexander H. Bell, Jr., all of Washington, D. C., were on brief, for appellee. Messrs. Charles R. Denny, Jr. and Dwight H. Doty, both of Washington, D. C., entered appearances for the appellee.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

GRONER, C. J.

This is an appeal by a landowner in a condemnation proceeding instituted by the United States to acquire lands for the road development program of the National Capital Parks, Parkway and Playground System. The property involved consists of two and a half acres of a thirty-one acre tract of land adjoining the Baltimore & Ohio Railroad right of way in the District of Columbia. Appellant acquired the tract about thirty years ago and constructed on a part of it a plant for making brick. The plant has been in operation continuously, and during the entire thirty years brick and sand have been sold to builders in the District of Columbia and vicinity. Of the acreage of the entire tract about one-fifth is denominated "sand land", and the particular two and a half acres taken by the United States is a solid sand bank sloping from a height of forty to ninety feet above the level of the adjoining railroad tracks. The bank contains approximately 300,000 cubic yards of sand, weighing approximately 450,000 tons. Appellant valued the land taken at $67,500. The jury awarded $9,000.

[1] The record does not include the pleadings and the evidence is condensed to a degree that makes it difficult to determine precisely what occurred at the trial, but enough appears, we think, to show that error was committed by the Court in the rejection of material evidence.

At the trial Mr. Dalley, a part owner of the property and manager of the Brick Company, testified that the most valuable use to which the two and one-half acres proposed to be taken could be put was the manufacture of brick and the sale of sand to contractors for making building mortar, that the property adjacent to it had been so used during the past thirty years, and that the sale of sand was on a per ton basis, appellant either making delivery at building operations in the District of Columbia, or permitting the purchaser to remove the sand from the bank into his own trucks.

He testified "that the value of the land for the sand contained therein was $67,500, which testimony, on motion of the United States, was stricken out, because he has estimated the value by the value of the sand per ton."

Another witness, William Obrey Steel, who is engaged in the District of Columbia in the business of buying and selling sand and operating a sand pit, was asked to testify to the value of the sand per ton "in the bank just as it is now." On objection by the United States, the Court refused to allow the witness to answer. Again, he was asked, "Have you bought sand of the same quality as the sand contained in this two and a half acres?" He answered that he had. He was then asked what he had paid for it. An objection to this question was sustained, whereupon a colloquy among counsel and the Court ensued, during the course of which the Judge remarked to counsel for the landowner: "You are entitled to get the fair market value of your property for land as real estate. That is what you are entitled to. You are trying to get most everything but that."

The same witness was thereupon asked whether, in view of his experience with "sand land" and in the purchase of sand, he was in position to state what the fair market value of this particular land was at the present time. This question too, the Court refused to allow to be answered, stating to counsel: "He, (the witness) is not the owner. The owner can testify to his opinion of its value, but he isn't a real estate man. You know that just as well as I do."

It is quite true that a subsequent witness was permitted to answer most of these questions and to testify that the property as a sand bank was worth $25,000 or $30,000 an acre. But in spite of this, we think sufficient harm had been done by the rejection of proper evidence of value, coupled with the Judge's statement limiting the appraisal to the value as real estate, to leave the jury bewildered as to the proper elements to be taken into consideration in ascertaining the fair market value of the property.

Obviously, the Court was originally of opinion that the presence on the property of the sand bank forty to ninety feet high, containing 300,000 cubic yards of pure sand was of no consequence in determining the value of the property taken, and that the added value by reason of the presence of the sand should not be considered. On this theory most of the evidence of the additional value of the sand in the bank as it was and of the additional value of the property by reason of presence of the sand was rejected.

■ This opinion of the Court was, of course, wrong, for no rule is better established than that the special value of land due to its adaptability for use in a particular business is an element which the owner of land is entitled to have considered in determining the amount to be paid in just compensation.

So much as this was said by the Supreme Court in Mitchell v. United States, 267 U. S. 341, 45 S.Ct. 293, 69 L.Ed. 644. And we know of no other evidence by which the jury could be properly guided in determining the value of the property than to be told the per ton value of the sand as it lay, or, without this knowledge, how the jury could ever have reached a judgment based on anything more than guess or speculation.

■ Counsel for appellant was not seeking to prove the profit derived from the sale of the sand, or the value or price of the sand after it had been taken out of the bank. In questioning these witnesses he was seeking to show the value of the land with regard to the best use that could be made of it. This is the standard by which the jury was to make an award. In order that they might apply this standard it was necessary that they know the quantity and quality of the sand and its value at the time of taking in its natural condition in the bank. Counsel's questions were confined to these issues. Montana Ry. Co. v. Warren, 137 U.S. 348, 11 S.Ct. 96, 34 L.Ed. 681. See, also, Manning v. City of Lowell, 173

Mass. 100, 53 N.E. 160; Creighton v. Board of Com'rs, 143 N.C. 171, 55 S.E. 511, 10 Ann.Cas. 218; Savings & Trust Co. v. Pennsylvania R. Co., 229 Pa. 484, 78 A. 131.

In the leading case of Boom Co. v. Patterson, 98 U.S. 403, 408, 25 L.Ed. 206, the Court held that the adaptability of lands located in the Mississippi River for a logging boom was a proper element in estimating their value. It was there said: "So many and varied are the circumstances to be taken into account in determining the value of property condemned for public purposes, that it is perhaps impossible to formulate a rule to govern its appraisement in all cases. Exceptional circumstances will modify the most carefully guarded rule; but, as a general thing, we should say that the compensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future."

What is already said receives additional emphasis from the fact that the Government's witnesses in this case were real estate men who testified in the main in relation to the value of the land for real estate development and who, when asked about the added value of the sand bank, treated it as an encumbrance which would have to be removed for building operations, rather than as an added value to the land.

James W. Campbell, the single witness of the Government who was in the sand business, confined himself on the subject of value to the statement that he had a ten years' supply of sand on hand and for that reason he had not inquired as to other sources of sand supply or their value. But he and the other witnesses for the Government were permitted to state what in their opinion was the value of the land for real estate development purposes alone.

We think the inquiry should have been whether the property was valuable in the open market for the sale of sand or for the use of sand in the making of bricks; and that in order to reach a fair conclusion in this respect the jury should have been informed by competent witnesses as to the quantity of the sand, the quality of the sand, the uses to which it might be put, whether there was a market for it, and the value of the land with the sand in that market in its then condition.

Reversed and remanded for a new trial in accordance with this opinion.